## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

JOANN CARTER,

        Plaintiff,

vs.

CAROLYN W. COLVIN, Commissioner
of Social Security,

        Defendant.

No. C12-4085-MWB

**REPORT AND
RECOMMENDATION**

---

### *Introduction*

Plaintiff Joann Carter seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DIB) pursuant to Title II and supplemental security income (SSI) pursuant to Title XVI of the Social Security Act, 42 U.S.C. § 401 *et seq.* (Act). Carter contends the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she is not disabled. For the reasons discussed below, I recommend the ALJ's decision be affirmed.

### *Background*

Carter was born in 1985 and completed high school. She previously worked as a hostess, stock clerk, child monitor, cashier and kitchen helper/dishwasher. AR 196. Carter filed for SSI on August 26, 2009, and DIB on October 22, 2010, alleging disability beginning on August 1, 2009, due to seizures. AR 125-28, 136-39, 151-59. Her claims were denied initially and on reconsideration. AR 72-77, 81-84. Carter

requested a hearing before an Administrative Law Judge (ALJ). AR 88. On January 7, 2011, ALJ Denzel Busick held a hearing via video conference during which Carter, Carter's sister, and a vocational expert (VE) testified. AR 28-58.

On July 11, 2011, the ALJ issued a decision finding Carter not disabled since August 1, 2009. AR 9-22. Carter sought review by the Appeals Council, which denied review on July 27, 2012. AR 1-3. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On September 25, 2012, Carter filed a complaint in this court seeking review of the ALJ's decision. This matter has been referred to me pursuant to 28 U.S.C. § 636(b)(1)(B) for the filing of a report and recommended disposition of the case. The parties have briefed the issues and the matter is now fully submitted.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity (RFC) to determine the claimant's "ability to

meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the

4

burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *Summary of ALJ's Decision*

The ALJ made the following findings:

(1)    The claimant meets the insured status requirements of the Social Security Act through September 30, 2009.

(2)    The claimant has not engaged in substantial gainful activity since August 1, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)    The claimant has the following severe impairments: seizure disorder; obesity; and a probable learning disability, NOS (20 CFR 404.1520(c) and 416.920(c)).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of medium to light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can pick up 50 pounds occasionally and 25 pounds frequently, sit about 6 hours in an 8-hour workday (with normal breaks), and stand and/or walk about 6 hours in an 8-hour workday (with normal breaks). The claimant has no limits in reaching, and no postural limits except that she should avoid ladders, ropes, or scaffolds. The claimant has no limits visually, with proper glasses, and no communicative or manipulative limits. Environmentally, the claimant must avoid any exposure to any hazards, such as

unprotected heights and fast and dangerous machinery, and must avoid concentrated exposure to hot temperatures and high humidity. The claimant has some mild limits on activities of daily living, has mild up to moderate limits in her ability to understand and remember details, moderate limits on her ability to carry out detailed instructions, mild up to moderate limits in dealing with general public, mild up to moderate limits in dealing with co-workers and adapting to changes in a work setting.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7) The claimant was born on January 1, 1985 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2009, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 11-21. At Step Two, the ALJ described Carter's impairments and determined which were severe. He found that seizure disorder, obesity and probable learning

disability all resulted in more than minimal functional limitations and were therefore severe impairments. He noted that Carter's obstructive sleep apnea was well-controlled with the use of a CPAP machine at night. Because Carter did not allege any limitations related to this impairment and nothing in the record indicated that it caused more than minimal limitations, the ALJ found it non-severe. The ALJ also found Carter's depression was non-severe as Carter did not allege that impairment as a basis for disability, her sister did not identify any limitations related to depression and Carter did not take any antidepressants. AR 12-13.

At Step Three, the ALJ found that none of Carter's impairments or combination of impairments met or equaled a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. The ALJ considered listings 11.00 (Neurological) and 12.02 (Organic Mental Disorders). Under 11.00, the ALJ noted no treating or examining physician indicated findings that would satisfy the severity requirements of any listed impairment. Under 12.02, the ALJ found the "paragraph B" criteria were not satisfied because Carter had only mild restriction in activities of daily living, mild difficulties in social functioning and moderate difficulties in concentration, persistence or pace, where marked restrictions were required to satisfy the listing. She also had no episodes of decompensation that were of extended duration. The ALJ also found her mental impairment did not meet the "paragraph C" criteria because Carter did not have repeated episodes of decompensation each of extended duration, there was no evidence that a marginal adjustment or minimal increase in mental demands or change in the environment would cause her to decompensate or that she had a history of one or more years' inability to function outside of a highly supportive living arrangement with a continued need for such an arrangement. AR 13-15.

The ALJ then moved to Step Four and analyzed Carter's RFC. In doing so he considered Carter's subjective allegations, Carter's sister's testimony and the medical evidence in the record. As for Carter's physical limitations, the ALJ found that Carter's obesity limited her to medium to light work and due to the combined effects of

her obesity and seizure disorder she should avoid ladders, ropes and scaffolds and exposure to any hazards such as unprotected heights and fast and dangerous machinery. AR 16.

The ALJ then summarized the evidence concerning Carter's seizures. He noted that the evidence suggested Carter had increased seizures when she was in stressful situations so he limited her to unskilled work and noted other mild-to-moderate limitations in interacting with the general public and co-workers and adapting to changes in a work setting. Based on Carter's testimony that she had difficulty in a past work environment with high heat and humidity, the ALJ also included a limitation that she should avoid these conditions.

The ALJ discredited the severity of limitations that Carter and her sister alleged. The ALJ noted that Carter's activities of daily living – which included cooking, laundry, cleaning dishes, vacuuming, taking care of children and a pet, taking her daughter to the bus stop, shopping for groceries and reading on a daily basis – did not demonstrate she was as limited as alleged. AR 18. He also noted that Carter's work history as a cashier and a daycare provider did not support a finding of disability because the record did not show that Carter stopped working due to her seizures or that her seizures affected her ability to perform basic work activities. *Id.* Although Carter's sister alleged that Carter had a cognitive impairment, a consultative examination demonstrated that Carter had "average or normal intellectual functioning" and was capable of performing unskilled work. *Id.*

Finally, the ALJ considered the opinion evidence. He gave the state agency medical consultant's physical assessment little weight because the record as a whole demonstrated Carter had some physical limitations. He gave the state agency medical consultant's mental assessment great weight as it was consistent with the record as a whole. The ALJ gave no weight to the opinion of Ronald Creswell, M.D., that Carter was "medically disabled and unable to do any kind of work" as more recent and extensive medical evidence conflicted with his diagnoses of "epilepsy not responding to

medication with frequent seizures plus mental retardation." AR 19. The ALJ gave Carter's sister's opinions little weight because he found them less persuasive than the objective evidence and she did not have the background or training in Social Security regulations to support her conclusions.

The ALJ found that his RFC determination was supported by extensive diagnostic testing from a seizure specialist who concluded Carter's seizures were psychiatric and not epileptic in nature. Carter's treatment notes also indicated that her seizures were less frequent when she was not under stress and that Carter had quit past jobs because she moved, not because her seizures interfered with her ability to work. The ALJ noted that Carter's seizures also did not appear to interfere with her activities of daily living, including caring for her children. Psychological testing had revealed a mild cognitive impairment, consistent with a learning disability, but the ALJ noted this was consistent with other mental health records and did not prevent Carter from performing the range of unskilled work provided in the RFC.

At Step Five, the ALJ concluded Carter was not able to perform any of her past relevant work under this RFC, but she was able to perform work as a stocker checker (apparel) and locker room attendant. Because these jobs were available in significant numbers in the regional and national economy, the ALJ determined that Carter was not disabled within the meaning of the Act.

### The Substantial Evidence Standard

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence

and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir.

1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

### Discussion

Carter argues the ALJ's decision is not supported by substantial evidence in the record as a whole. In support of this argument, she summarizes treatment notes from Dr. Payne, claimant's neurologist, but does not explain how this evidence undermines the ALJ's decision.[1] She does argue that a seizure event that occurred during an EEG study in March 2011 demonstrates that she suffers from more than just absence-type seizures and her condition is more serious than the ALJ found. Carter also disagrees with the ALJ's characterization of her seizure activity in the third hypothetical question presented to the vocational expert. I will address these issues by discussing the ALJ's evaluation of the medical evidence in the record and his hypothetical questions to the VE.

### A. Evaluation of the Medical Evidence

Carter appears to raise two issues with regard to the medical evidence. First, she seems to suggest that the evidence from Dr. Payne should have been given more weight. She cites treatment notes from January 2009 in which he opined Carter had epilepsy and "several seizure types including generalized tonic/clonic seizures, absence seizures, and atonic seizures" as well as some "partial complex seizures." AR 270. Second, she argues that evidence of a seizure during a recent EEG study undermines

---

[1] The Commissioner points out that Carter's brief does not cite cases, statutes or regulations, or otherwise develop a legal argument. I agree that Carter's argument is minimally developed – at best – which makes it difficult to determine the precise issues she is raising. In light of the standard of review that applies to judicial review of the Commissioner's decisions, individuals challenging those decisions would be well-advised to provide the court with coherent arguments.

conclusions that she suffers primarily from absence-type seizures and that her seizures are psychogenic non-epileptic in nature. The Commissioner argues Dr. Payne's treatment notes conflicted with more recent evidence in the record and they were based on plaintiff's subjective complaints more than objective medical findings. She also argues the EEG study does not support the level of severity that Carter alleges because she had one major motor event during ten days of observation that did not show any epileptic abnormalities. The Commissioner argues the majority of the medical evidence supports the ALJ's finding that Carter's seizure disorder is mild and she does not have epilepsy.

The claimant's RFC is a medical question and the ALJ's assessment must be supported by "some medical evidence" of the claimant's ability to function in the workplace. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). "It is the ALJ's responsibility to determine [the] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and claimant's own description of her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (citing *Page*, 484 F.3d at 1043). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). "An ALJ's failure to consider or discuss a treating physician's opinion that a claimant is disabled is error when the record contains no contradictory medical opinion." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)).

In evaluating Carter's seizures, the ALJ first considered her subjective allegations. Carter alleged she had seizures four to seven times a day. AR 16. She said most of the seizures were absence type, but she would also have seizures that would "make her fall down." *Id.* She took seizure medication but claimed it was no longer effective. As for the medical evidence, the ALJ noted that the most recent

evidence was from March 2011 when Carter underwent a 10-day evaluation that included continuous video and EEG monitoring. AR 16. Julie Hanna, M.D., of the Minnesota Epilepsy Group conducted this evaluation. During the evaluation, Carter experienced one "major motor event" that Carter said was a typical seizure for her. The EEG did not register any epileptiform changes during the event. Dr. Hanna diagnosed Carter with "nonepileptic seizures-psychogenic-unspecified" at discharge and recommended she stop taking the seizure medications Dr. Payne had prescribed. She advised Carter to continue therapy and recommended she establish treatment with a psychiatrist. She also suggested Carter try to work, as "staying at home or being isolated would likely not be helpful for her psychological symptoms." AR 17. Dr. Hanna's assessment was given great weight because the ALJ found it was well-supported with extensive narrative and detailed treatment notes and was consistent with records from other treating health care providers who suggested Carter's seizures were psychiatric. *Id.*

The ALJ did not discuss Dr. Payne's treatment records. Carter was referred to Dr. Payne in January 2009 by her primary care provider, Dr. Creswell, for "evaluation of a history of epilepsy." AR 270-71. At that appointment, Carter stated she was diagnosed with epilepsy when she was in the fourth grade. *Id.* Dr. Payne performed an EEG which came back abnormal, showing "frequent episodes of generalized poly spike and wave activity" which was "potentially epileptogenic in nature." *Id.* He indicated that he suspected potential juvenile myoclonic epilepsy. *Id.* Carter argues the EEG serves as objective evidence supporting Dr. Payne's impression of the existence of multiple seizure types.

Dr. Payne continued the medication that Carter had taken in the past for seizures. AR 270. He, or a physician assistant, continued seeing Carter throughout the year, mostly advising on medication adjustments during Carter's pregnancy. AR 267, 332-33, 340-42. In June 2010, Dr. Payne saw Carter for a follow-up with complaints of increased seizure activity. AR 339. At that time, Carter indicated she was having

absence seizures two or three times a day and a "big seizure" about twice per month. *Id.* Dr. Payne continued her medications and ran tests to determine if the dosages could be increased. *Id.* In November 2010, after reports of still-increasing seizures in recent months, Dr. Payne added Keppra to Carter's medications. In this treatment note he indicated she had "generalized seizure disorder" and his "working diagnosis" was juvenile myoclonic epilepsy based on Carter's reports that she had seizures at a young age. AR 269, 426. Later that month, Carter's sister called to report significant side effects from the Keppra medication and worsening seizures. *Id.* Dr. Payne suggested Carter be evaluated at the Epilepsy Center at the University of Iowa Hospitals and Clinics and set up an appointment there for her. *Id.*

Because Carter makes no argument with regard to Dr. Payne's treatment notes, it is unclear why she believes they undermine the ALJ's decision. I do not find any error in the ALJ's failure to discuss these notes. These treatment notes represent initial, cursory findings of Carter's seizure disorder as indicated by Dr. Payne's notation of a "working diagnosis" almost two years after her first visit. AR 426. Dr. Payne based his diagnosis on EEG results that were "potentially epileptogenic in nature" and Carter's own description of her symptoms. Dr. Payne referred Carter to a specialist when her condition did not respond to the epileptic medication he prescribed. The record contains evidence from specialists at the University of Iowa Hospitals and Clinics and the Minnesota Epilepsy Group that is more recent, more thorough and contains findings contrary to those of Dr. Payne. As such, the ALJ did not err in relying on that evidence, rather than Dr. Payne's treatment notes, in assessing the severity of Carter's seizure disorder.

Carter's second argument concerning the medical evidence challenges the findings of the specialists with the Minnesota Epilepsy Group. She argues that the "major motor event" she experienced during testing was a typical seizure for her and

supports her claims of a disabling impairment, notwithstanding Dr. Hanna's conclusion[2] that her seizures were psychogenic and non-epileptic in nature. Although she does not say so explicitly, her argument implies that Dr. Hanna misdiagnosed her and that substantial evidence in the record supports a finding that she has epilepsy.

As noted above, the ALJ primarily relied on the treatment notes from Dr. Hanna to determine the severity and limiting effects of Carter's seizure disorder. Dr. Hanna conducted a 10-day continuous video/EEG monitoring "for the purposes of event clarification." AR 536. Carter experienced one major motor event during that procedure but the EEG did not show any epileptiform changes during the event. *Id.* Carter also reported multiple episodes where she felt she was losing her balance, but these did not correlate on the EEG. The remainder of the EEG showed no epileptiform abnormality. *Id.* Dr. Hanna diagnosed Carter with psychogenic nonepileptic seizures and did not restart her seizure medications. She advised Carter to continue therapy and to establish treatment with a psychiatrist. *Id.* She also recommended that Carter try to work because "staying at home or being isolated would likely not be helpful for her psychological symptoms." AR 537-38.

The occurrence of one major motor event during Carter's evaluation by Dr. Hanna does not demonstrate that Carter's seizure disorder is more severe than the ALJ found. Dr. Hanna considered this major motor event in diagnosing Carter and noted the EEG showed no epileptiform changes during this event or at any other time. In addition, the ALJ rightly noted that Carter's 10-day evaluation did not support her allegation that she experienced seven to ten seizures per day. AR 17. While evidence of the major motor event may demonstrate that Carter suffers from pseudoseizures or

---

[2] Carter refers to Dr. Dickens and Dr. Hanna as providing the diagnosis following her 10-day evaluation in March 2011. It appears from the record that Dr. Dickens performed the intake evaluation on March 7, 2011, and ordered the video/EEG testing, while Dr. Hanna reviewed the results and discussed them with Carter. AR 536-43. Dr. Hanna authored the final assessment and diagnosed Carter with "nonepileptic seizures-psychogenic-unspecified." AR 536.

more than absence-type seizures, it does not demonstrate that her seizures prevent her from performing full-time work.

Other evidence in the record supports Dr. Hanna's diagnosis. In March 2006, Panna Shah, M.D., advised Carter to see a psychiatrist because "some of her episodes are not real seizures." AR 259. In October 2010, Carter was taken to the emergency room because of a seizure and the doctor opined that Carter was likely experiencing a pseudoseizure rather than a true seizure. AR 412-15. In December 2010 and January 2011, Mary Werz, M.D., a specialist with University of Iowa Hospitals and Clinics, evaluated Carter and performed a video/EEG diagnostic, MRI and neuropsychological testing. AR 480-84. After four days of testing, Dr. Werz concluded that the "EEG was abnormal showing brief paroxysmal theta that is a non-specific finding of uncertain significance." AR 518. No definitive epileptiform discharges were noted and the one event of staggering did not have an EEG or EKG correlate. *Id.* Dr. Werz also recommended that Carter see a psychiatrist for assessment of her symptomatology. AR 506.

Only Dr. Payne's treatment notes arguably contradict Dr. Hanna's conclusions. As noted above, however, Dr. Payne only performed one test, which was inconclusive, and then referred Carter to a specialist. As such, I conclude that the ALJ did not err in giving Dr. Hanna's assessment great weight. He found it to be well-supported by extensive narrative and detailed treatment notes and was consistent with records from other treating sources suggesting that Carter's seizures were psychiatric in nature. AR 17. This finding is supported by substantial evidence in the record as a whole. The ALJ's evaluation of the medical evidence, and the resulting RFC determination, was not erroneous.

### B.    *Hypothetical Questions to the VE*

Carter argues the ALJ erred in his third hypothetical to the VE when he included a limitation that an individual might have five to six petit mal seizures or absent

seizures throughout the day that would only last 15 to 20 seconds. She contends this characterization of Carter's seizures is not supported by substantial evidence in the record as a whole. The Commissioner points out that this limitation was ultimately not adopted into the ALJ's RFC, so the ALJ did not rely on the VE's answer to this hypothetical in determining whether Carter could perform other work available in the national economy. Moreover, the Commissioner argues the ALJ could have relied on the VE's response to the third hypothetical because it matched Carter's own description of her seizures, was supported by medical evidence and the VE testified it would not prevent her from performing the jobs he had identified.

"A vocational expert's testimony constitutes substantial evidence when it is based on a hypothetical that accounts for all of the claimant's proven impairments." *Buckner v. Astrue*, 646 F.3d 549, 560-61 (8th Cir. 2011) (quoting *Hulsey v. Astrue*, 622 F.3d 917, 922 (8th Cir. 2010)). "[A]n ALJ may omit alleged impairments from a hypothetical question posed to a vocational expert when [t]here is no medical evidence that these conditions impose any restrictions on [the claimant's] functional capabilities or when the record does not support the claimant's contention that his impairments significantly restricted his ability to perform gainful employment." *Buckner*, 646 F.3d at 561 (quoting *Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008) (internal quotations omitted)).

The ALJ provided the following hypothetical to the VE:

> If we assume we've documented the past work of a hypothetical individual who worked at a medium level, pick up 50 pounds occasionally, 25 frequently, sit six hours out of an eight hour work day, stand and walk combined six, no limits to reach, no postural limits other than they should avoid ladders, scaffolds or ropes, and no other limits. Visual is okay with proper glasses. Environmentally however, this person would be advised to avoid exposure to any hazards such as unprotected heights, fast or dangerous machinery. It should also be noted they would have some mild limits on their activities of daily living. We have mild

> up to moderate limits on the ability to carry out detailed
> instruction. Mild up to moderate limits in dealing with the
> general public. And some mild up to moderate limits in
> dealing with coworkers adapting to changes in their work
> setting. Taking into account those restrictions, would such a
> person do any of the past jobs?

AR 54. The VE answered that none of Carter's past work would be available under this hypothetical. The ALJ then added the additional factor that the person needed fairly simple, routine, non-stressful work with reduced contact with the public and co-workers. AR 55. The VE identified several light duty unskilled jobs that would be appropriate under this hypothetical. *Id.* The VE also testified that these jobs would not involve concentrated exposure to warm temperatures or high humidity. AR 56.

The ALJ then asked the VE if his opinion would change for a person who might have five to six petit mal seizures or absent seizures throughout the day that would last only 15 to 20 seconds. The ALJ clarified, "These are not falling down seizures, these are not seizures where a person has contractions, these are simple absent seizures for a few seconds." *Id.* The VE answered, "I don't see . . . problem with that in these kinds of jobs." *Id.* Carter argues the ALJ's description of her seizures is inaccurate and inconsistent with substantial evidence in the record as a whole.

Even if I were to accept Carter's argument, reversal would not be required because the ALJ did not include this limitation in his RFC. The ALJ's RFC included the limitations identified in the first hypothetical and the additional limitation of avoiding concentrated exposure to warm temperatures and high humidity. AR 15. The RFC did not include a limitation that Carter could be expected to have five to six absent seizures per day that would last 15 to 20 seconds. Therefore, any testimony based on this limitation is irrelevant to the ALJ's ultimate decision.

If Carter is arguing that the ALJ *should* have included this limitation in the RFC (or one that matches her description of her seizures), I also disagree for reasons largely discussed in the preceding section of this report and recommendation. The only

evidence to support such a limitation is Carter's and her sister's allegations that she experiences seven to ten seizures on a daily basis. The ALJ expressly discredited these allegations. AR 16, 19. Carter does not even attempt to argue that the ALJ erred in this aspect of his decision. I find that the ALJ's credibility assessment is supported by substantial evidence in the record as a whole.

The ALJ first noted that the medical evidence did not support Carter's allegation that she suffered seven to ten seizures a day. He cited the ten-day evaluation in March 2011, during which Carter experienced only one major motor event. AR 536. Carter had reported several episodes during this evaluation where she felt like she was losing her balance, but these did not correlate to the EEG. AR 536-37. Dr. Hanna recommended Carter try to work because staying at home or being isolated would not be helpful for her psychological symptoms. *Id.* As discussed in the preceding section, the ALJ gave this evidence proper weight as it is consistent with other evidence in the record.

The ALJ also discredited Carter's allegations based on her past work record and activities of daily living. The ALJ noted that Carter was able to perform at the substantial gainful activity level in the past and quit these jobs because she moved. Carter alleged she had also quit because of her seizures, but the ALJ found this reason was not supported by the record and was inconsistent with her reported activities of daily living. These included caring for herself without any difficulty, taking care of two young children and performing a variety of household chores including cooking, cleaning and shopping.

The ALJ also discredited Carter's sister, including her allegation that Carter experienced at least 10 small seizures a day. The ALJ found her allegations were "less persuasive than the objective evidence" and she did not have the necessary background or training in Social Security regulations to support her conclusions. In addition, the ALJ noted that the evidence contained in the record as a whole, including the testimony

at the hearing, showed that Carter's symptoms and resulting limitations would not preclude all work activity.

Because the ALJ provided good reasons for discrediting Carter's and her sister's allegations that she experiences multiple seizures per day, I will defer to the ALJ's credibility determination. *See Jones v. Astrue*, 619 F.3d 963, 975 (2010) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination."). Moreover, the ALJ did include other limitations related to Carter's seizures that were supported by the record as a whole. The hypothetical questions and the ultimate RFC included limitations of unskilled work and indicated Carter would be mild-to-moderately limited in dealing with the public and co-workers and adapting to changes in the work setting based on her testimony and medical records indicating stress increased the frequency of her seizures. AR 15, 17. These limitations are supported by substantial evidence in the record as a whole.

In short, I find that the ALJ's hypothetical questions to the VE were supported by substantial evidence in the record. The VE's testimony in response to those questions provides substantial evidence supporting the ALJ's conclusion that Carter could perform other work available in the national economy. I also find that the ALJ did not commit error by omitting from Carter's RFC a limitation based on her allegation as to the frequency and type of seizures.

### Conclusion and Recommendation

For the reasons discussed above, I RESPECTFULLY RECOMMEND that the Commissioner's decision be **affirmed** and that judgment be entered against Carter and in favor of the Commissioner.

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the

parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED.**

**DATED** this 26th day of September, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE